IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BALIVI CHEMICAL CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>JMC VENTILATION REFRIGERATION, LLC, a Washington Limited Liability Company, JMC ENTERPRISES, INC., a Washington Corporation, and JOEL MICKA, an Individual,<br><br>        Defendants. | Case No. CV-07-353-S-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion to consolidate and a motion to disqualify counsel, both filed by defendants. The Court heard oral argument on January 4, 2008, and took the motions under advisement. For the reasons expressed below, the Court will deny the motion to consolidate and reserve ruling on the motion to disqualify.

### 1. **Motion To Consolidate**

Defendants (referred to collectively as JMC) seek to consolidate *Balivi v. JMC*, CV-07-353-S-BLW with *1,4Group v. JMC*, CV-07-354-S-BLW.

**Memorandum Decision and Order – Page 1**

Consolidation is proper under Rule 42 (a) when the two actions involve "a common question of law or fact."  The Court must "weigh[ ] the saving of time and effort consolidation would produce against any inconvenience, delay or expense that it would cause." *Single Chip Systems Corp. v. Intermec IP Corp.*, 495 F.Supp. 2d 1052, 1057 (S.D.Cal. 2007) (quoting *Huene v. United States*, 743 F.2d 703, 704 (9th Cir.1984)).  When actions involving a common question of law or fact are pending before a court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.  *Single Chip*, 495 F.Supp. 2d at 1057.  The party seeking consolidation bears the burden of establishing that the judicial economy and convenience benefits of consolidation outweigh any prejudice.  *Id.*

The motion requires the Court to compare the two cases.  In *Balivi*, the plaintiff alleges that JMC infringed the '525 patent.  The patent describes a mechanical device used to reduce airflow in potato storage buildings.  While these buildings usually need a robust ventilation system to keep stored potatoes cool, the turbulent air flow causes problems for applicators spraying the potatoes with sprout-inhibiting chemicals.  To reach the potatoes, the sprayed chemicals need to remain as an aerosol suspended in air.  However, the fast air flow created by the

**Memorandum Decision and Order – Page 2**

ventilation system causes the aerosol chemicals to condense on the ventilation machinery, wasting a significant amount of the chemicals and creating a coating that is difficult to remove.  To reduce the air flow during spraying, the '525 patent describes the use of a variable frequency generator that can alter the power supplied to the fan motors, allowing them to be operated at a reduced speed during spraying and increased thereafter.

The *1,4Group* case alleges that JMC infringed the '660 and '888 patents.  These patents describe a process for melting solid CIPC and transforming it into an aerosol to be sprayed on stored potatoes as a dormancy-enhancer.  The key to the invention, as described in the patents, is that the process does not require that solvents be mixed with the CIPC to aid in its transformation from a solid block to an aerosol.  Previously, solvents were added to the CIPC to assist in its melting and ensure that it remain in liquid form as it is turned into an aerosol.  But solvents, when heated, can create toxic gases that render the potato storage buildings unsafe for some period of time after spraying.  The invention described in these patents allows the use of a block of pure, solid CIPC that is easy and safe to transport, and that can be melted and transformed into an aerosol without creating any toxic gases.

To summarize, the *Balivi* patent involves an electrical device used to reduce

**Memorandum Decision and Order – Page 3**

the power frequency supplied to air fan motors, while the *1,4Group* patents involve a method for heating solid CIPC and forming an aerosol. One case involves a device or apparatus patent; the other involves method or process patents.

JMC's counsel stated at oral argument that he was not advocating consolidation for trial purposes at this time, leaving open whether he would request it later. At this point, the cases appear to lack the sufficient commonalities necessary to warrant consolidation. While that could change, the Court is not inclined at this point to consolidate the cases for trial purposes.

JMC's counsel seeks to consolidate the cases for discovery. There could be an overlap in three main areas: (1) depositions; (2) document production; and (3) site investigations. This overlap, however, is not sufficient to warrant consolidation for discovery purposes. The Court is confident that counsel can stipulate to apply overlapping discovery to both cases without having to engage in expensive and unnecessary duplicative discovery.

For all these reasons, the Court will deny the motion to consolidate.

## MOTION TO DISQUALIFY

**2.**     **Factual Background**

JMC seeks to disqualify attorney Edgar Cataxinos and his law firm TraskBritt from representing the plaintiff. JMC asserts that Cataxinos represented

JMC, and has violated Idaho's Rules of Professional Conduct by suing a client. Cataxinos denies this charge.

The TraskBritt firm has represented Balivi, 1,4Group, and related entities since 1989 in multiple patent, trademark, and intellectual property matters. *See Cataxinos Declaration* at ¶ 21. The firm has billed these entities over $8 million in fees since that time. *Id*.

In February of 1999, Cataxinos agreed to represent JMC Enterprises. According to a Legal Representation Agreement, he was "to represent [JMC Enterprises] in certain legal matters including: Trademark Matters (and such additional matters as [JMC Enterprises] may subsequently designate orally or in writing)." *See Legal Representation Agreement* attached as Exhibit 1 to Micka Affidavit.

JMC Enterprises was a Washington corporation. As Cataxinos was preparing the trademark application, he was informed by JMC's President, Joel Micka, that "the trademark would be owned and used by JMC Ventilation as opposed to JMC Enterprises." *See Cataxinos Declaration* at ¶ 17. JMC Ventilation was a Limited Liability Corporation created by Micka. He and his wife were the sole members.

On June 24, 1999, Cataxinos filed a trademark application with the Patent

**Memorandum Decision and Order – Page 5**

and Trademark Office (PTO) on behalf of JMC Ventilation LLC.  The PTO issued the trademark on July 10, 2001.

To renew the trademark, JMC would need to file papers by certain prescribed deadlines. Micka alleges that to ensure compliance with these deadlines, he "asked [Trask Bitt] to be responsible for monitoring our registration."  *See Micka Declaration* at p. 5, ¶ 13.  Cataxinos denies this: "I did not have any conversation with him [Micka] after the issuance of the . . . trademark in 2001." *See Cataxinos Declaration* at ¶ 19.

Cataxinos did, however, create a reminder list of the important renewal deadlines through the year 2012.  *See Exhibit 6 attached to Micka Declaration.* When the trademark rules changed in 2002, Cataxinos sent a letter to JMC's President, Joel Micka (dated July 16, 2002) advising him of the changes, and billed JMC $26.50 for the letter.

Consistent with his reminder list of renewal deadlines, Cataxinos sent a letter to Micka on July 12, 2006, reminding him of the renewal deadline of July 10, 2007.  He also billed JMC about $100 for this reminder.

On September 11, 2006, about two months after Micka received this reminder letter, he received a letter from attorney Bill Mauk, stating that "our firm, together with the . . . law firm of TraskBritt, represents the legal interests of the

**Memorandum Decision and Order – Page 6**

inventors and owners of the above patents," including the '525 patent at issue in *Balivi v JMC* and the "660 and '888 patents at issue in *1,4Group v JMC*. Mauk describes each patent in order to "put your company on notice" because "your actions may infringe upon our clients' patent rights under one or more of these patents."

Mauk admits in the letter that his concerns may be based on incomplete information: "Although we may not yet fully appreciate in every instance how JMC Enterprises uses and applies solid CIPC brick products and other sprout inhibitors, the information our clients have compels raising these concerns." He invites JMC to share "any information contrary to what is represented by this letter" to "avoid an unnecessary legal dispute." He also offers to discuss licensing, and finishes by demanding that JMC "please take whatever steps are necessary and appropriate to curtail any activities that directly or indirectly infringe" the three patents.

Micka "thought the letter was, at best, a betrayal of our ongoing relationship." *See Micka Declaration* at p. 6, ¶ 17. Nonetheless, Micka "spoke with Mr. Cataxinos later in fall 2006 in response to his July 12, 2006, letter regarding the affidavit due in July 2007." *Id*. at ¶ 18. Micka describes that conversation as "awkward to say the least." *Id*. Micka states that Cataxinos

**Memorandum Decision and Order – Page 7**

"provided me with additional legal advice regarding the affidavit that was due to the [PTO] in July 2007 regarding our . . . trademark registration." *Id*. Micka "also discussed with Mr. Cataxinos certain issues related to copyright protection . . . [and] he briefly advised me regarding the legal requirements for such protection and we discussed future copyright work on behalf of JMC Ventilation." *Id*. at ¶ 19. Cataxinos responds that after examining all his files, he can find "no evidence of such discussions," and he specifically denies discussing "any copyright matters with Mr. Micka at any time." *See Cataxinos Declaration* at ¶ 19.

On June 4, 2007, about nine months after the demand letter, Cataxinos sent a letter to Micka, in his capacity as a member of JMC Ventilation LLC., stating that "TraskBritt will take no further action on your behalf. We are enclosing our files." *See Exhibit 8 to Micka Declaration.* Cataxinos enclosed with the letter two files regarding JMC, including a Withdrawal of Counsel form that was submitted to the PTO. *See Cataxinos Declaration* at ¶ 23. In that Withdrawal, Cataxinos represented to the PTO that JMC Ventilation was "no longer represented by this firm [TraskBritt]." *See Exhibit 9 to Micka Declaration*. Cataxinos submitted the Withdrawal motion on June 4, 2007, and it was granted the same day. *Id*.

Two months later, on August 21, 2007, Mauk and Cataxinos sued (1) JMC Enterprises Inc., (2) JMC Ventilation LLC., and (3) Micka for infringing the '525

**Memorandum Decision and Order – Page 8**

patent, *see Balivi v. JMC*, Civ. No. 07-353-S-BLW, and for infringing the '660 and '880 patents, *see 1,4Group v. JMC*, Civ. No. 07-354-S-BLW.

## ANALYSIS

All attorneys practicing before this Court "must familiarize themselves with and comply with the Idaho Rules of Professional Conduct of the Idaho State Bar and decisions of any court interpreting such rules." *See Local Rule 83.5.* Pursuant to the Idaho courts' interpretation of those Rules, JMC bears the burden of proving that TraskBritt should be disqualified. *See Weaver v. Millard*, 819 P.2d 110 (Id.App.Ct. 1991).

The Idaho Rules, pertaining to this case, prohibit an attorney from (1) representing a client "if the representation involves a concurrent conflict of interest," *see Rule 1.7(a)*; (2) representing a client against a former client in the "same or a substantially related matter," *see Rule 1.9(a)*; and (3) using information related to the former client to the disadvantage of the former client, with some exceptions, *see Rule 1.9(c)*.

The application of these Rules to the facts raise four questions that can be analyzed in a "decision tree" format. First, when did Cataxinos cease representing JMC? If it was in 2001 when he obtained the trademark for JMC, he was clearly not concurrently representing JMC and 1,4Group when those two companies

**Memorandum Decision and Order – Page 9**

became adversaries much later, and hence Rule 1.7(a) was not violated. Neither was Rule 1.9 violated because the trademark matter and the present lawsuits are not substantially related.

However, if Cataxinos did not cease representing JMC until June 4, 2007 – when he formally withdrew – there is an issue whether JMC and 1,4Group were in conflict prior to that time, tarring Cataxinos with a concurrent conflict, and a potential violation of Rule 1.7(a). JMC argues that almost 9 months before Cataxinos withdrew, he and co-counsel Mauk sent the letter of September 11, 2006, to Micka, pitting 1,4Group against JMC at a time when Cataxinos represented both.

This argument raises the second major issue: When did JMC and 1,4Group become adversaries? If the two companies were in conflict at a time when Cataxinos represented both, there is a violation of Rule 1.7(a) and the third major issue arises: Does the Court have any discretion to fashion a remedy other than disqualification for a violation of Rule 1.7(a)?

If the two companies were not in conflict until after Cataxinos stopped representing JMC, the Court reaches the fourth major issue: Is Cataxinos using information he obtained from Micka to the disadvantage of JMC in violation of Rule 1.9(c)?

**Memorandum Decision and Order – Page 10**

The Court will discuss each of the four major issues below.

1. **<u>When Did Cataxinos Cease Representing JMC?</u>**

Cataxinos answers this question by asserting that his representation ended when the trademark was issued in 2001. He asserts that he was hired for that purpose, and that when he obtained the trademark, his duties – and hence his representation of JMC – was over. Micka responds that Cataxinos agreed to a continuing representation to track the trademark deadlines and advise him on renewal issues. Micka believed that Cataxinos was representing JMC at least until June 4, 2007.

The Idaho courts have not adopted a single test for determining whether an attorney-client relationship exists. They have instead evaluated claims under the two predominant tests adopted in other jurisdictions: (1) The controlling factor in the first test is the client's subjective belief, which must be reasonable under the circumstances; and (2) The controlling factor in the second test requires a contract analysis, finding that no attorney-client relationship exists absent clear assent by both the putative client and attorney. *Warner v. Stewart*, 930 P.2d 1030, 1035 (Id. 1997).

Under either test, an evidentiary hearing is needed. Micka argues that he had continuing contact with Cataxinos until late 2006, receiving both legal advice

**Memorandum Decision and Order – Page 11**

and fee billings, which he paid. These contacts led Micka to believe that Cataxinos was still representing him when he received the Mauk letter in September of 2006. Micka felt the Mauk letter was a "betrayal" because it placed JMC in direct conflict with 1,4Group, at a time when Cataxinos represented both.

Cataxinos denies giving legal advice to Micka after 2001, and characterizes the billings as involving trivial sums for insignificant matters. According to Cataxinos, his representation of JMC was for a single, discrete matter – obtaining a trademark – and there was no continuing relationship.

The Legal Representation Agreement seems to contemplate a continuing relationship by stating that Cataxinos would represent JMC on "Trademark Matters (*and such additional matters as [JMC Enterprises] may subsequently designate orally or in writing)*." (Emphasis added). It is unclear, however, whether JMC or Micka ever designated any further matters for Cataxinos orally or in writing. In addition, the Court's copy of this Agreement is unsigned, and so there is a question whether the parties intended to be bound by it in any event. These factual disputes will need to be sorted out in an evidentiary hearing.

JMC also argues that even as of June 4, 2007, Cataxinos failed to withdraw from representing JMC Enterprises, and only withdrew from representing JMC Ventilation. The Court disagrees. By returning both files, Cataxinos was clearly

**Memorandum Decision and Order – Page 12**

withdrawing from representing both entities. No reasonable person could believe otherwise. That issue will not be pursued at the evidentiary hearing.

**2.     When Did JMC and 1,4Group Become Adversaries?**

This issue becomes relevant if Cataxinos did not end his representation of JMC in 2001. The Court will need to determine when JMC and 1,4Group became adversaries to determine if Cataxinos was representing both at a time when he had a concurrent conflict of interest.

Under the Idaho Rules, a concurrent conflict of interest exists if "the representation of one client will be directly adverse to another client." The Rule's comment section explains that an attorney has a duty not to "act as an *advocate* in one matter *against* a person the lawyer represents in some other matter." *See comment 6 to Rule 1.7* (emphasis added).

Thus, JMC must show that Cataxinos represented JMC at the same time that he was (1) acting as an advocate, (2) for a client (1,4Group) directly adverse to JMC. JMC argues that it was in direct conflict with 1,4Group when Mauk sent his letter on September 11, 2006. But the letter raises more questions than it answers.

Mauk's letter warns JMC that it might be infringing, but it also invites further discussion and negotiation. It lacks the intimidating tone many demand letters take when litigation is deemed inevitable, *i.e.*, when the parties are directly

**Memorandum Decision and Order – Page 13**

in conflict. The Court cannot find – as a matter of law – on this record that the Mauk letter so clearly pits the parties against one another that they could be deemed to be in conflict as of September 11, 2006.

Obviously, the parties were on conflict on August 21, 2007, when this suit was filed. An adversary relationship may have begun even sooner given the course of discussions between the parties. But from this record, the Court cannot identify the precise time when the companies became direct adversaries. Thus, the Court cannot find as a matter of law – without an evidentiary hearing – that Cataxinos violated Rule 1.7(a) by waiting until June 4, 2007, to withdraw.

It is also unclear what role Cataxinos played in representing 1,4Group at the time of the Mauk letter. It is not enough that Cataxinos was simply representing 1,4Group on September 11, 2006, if he knew nothing about Mauk's letter. Cataxinos must be acting as an *advocate* pursuing a course *against* the interests of JMC. The Court cannot tell if that was the case prior to June 4, 2007. What role did Cataxinos – or any TraskBritt attorney – play in drafting the Mauk letter? Was TraskBritt pursuing JMC as an adversary before June 4, 2007? These and other questions remain to be answered. The evidentiary hearing will address these issues.

3.     **Is Disqualification the Only Remedy for a Rule 1.7(a) Violation?**

**Memorandum Decision and Order – Page 14**

If Cataxinos was acting as an advocate for 1,4Group against JMC, he is subject to disqualification under Rule 1.7 even though the trademark matter for which he represented JMC is unrelated to the present litigation. *See Rule 1.7, comment 6* (concurrent representation is grounds for disqualification "even when the matters are wholly unrelated").

Cataxinos argues, however, that disqualification is discretionary with the Court. Idaho courts have held that judges generally have discretion to fashion a remedy after finding that an attorney has a conflict of interest under Rule 1.7. *See Crown v. Hawkins Co., Ltd.,* 910 P.2d 786 (Id.Ct.App. 1996). In *Crown*, the court found a violation of what is now Rule 1.7(a)(2) – prohibiting concurrent conflicts caused by "the personal interests of the lawyer." The court rejected the argument that the conflicted counsel should be "automatically disqualified," and held that whether disqualification was warranted was an issue "calling for the exercise of the court's discretion." *Id.* at 795. The court affirmed the district court's refusal to disqualify the attorney, pointing out the prejudice to the client of losing counsel just three weeks before trial, and the fact that the opposing party did not seek disqualification promptly. *Id.*

While *Crown* involved a violation of Rule 1.7(a)(2) rather than (a)(1), there is no principled distinction between them for remedy purposes; they prohibit

**Memorandum Decision and Order – Page 15**

equally pernicious conflicts with current clients.  Thus, *Crown* would apply with equal strength here, giving this Court discretion to fashion a remedy "which will assure fairness to the parties and the integrity of the judicial process . . . [and] [w]henever possible, . . . reach a solution that is least burdensome to the client." *See Weaver v. Millard*, 819 P.2d 110, 115 (Id.App.Ct. 1991) (also involving a attorney's conflict of interest).  The Court therefore holds that disqualification is not automatic upon a finding of a violation of Rule 1.7(a)(1).

4. **Did Cataxinos Violate Rule 1.9(c)?**

JMC argues that Cataxinos obtained confidential information from Micka that he could use against JMC in this litigation.  Cataxinos denies this charge and asserts that he received nothing that was not already public information.  This dispute cannot be resolved as a matter of law and hence must await the evidentiary hearing.

5. **Other Issues**

Cataxinos argues that he and his firm are immune from Rule 1.7's proscriptions because they withdrew before the lawsuits were filed against JMC.  But the filing date is not an "iron curtain" behind which no inquiry may go.  Rule 1.7 extends back to the time the clients were directly adverse to one another, which could occur before a complaint is filed.  *See generally Stratagem Development*

**Memorandum Decision and Order – Page 16**

*Corp. v. Heron International*, 756 F.Supp. 789, 793 (S.D.N.Y. 1991) (applying rule similar to Rule 1.7(a) to disqualify law firm that represented one client while "actively planning" litigation against another client).

The parties briefed and argued issues concerning whether Micka was represented by William Britt of the TraskBritt firm at a deposition, and whether Micka's Power of Attorney established representation by TraskBritt. While those issues remain to be resolved, the Court finds JMC's arguments unpersuasive, at least on the present record. The real issues in the case are defined by the four questions discussed above.

### 6.     Conclusion

For all of these reasons, the Court will reserve ruling on the motion to disqualify and set up an evidentiary hearing. The Court will deny the motion to consolidate.

### ORDER

In accordance with the terms of the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to consolidate (Docket No. 29) is DENIED.

IT IS FURTHER ORDERED, that an evidentiary hearing be held on the motion to disqualify (Docket No. 28) on January 24, 2008, at 9:00 a.m. in the

**Memorandum Decision and Order – Page 17**

James A. McClure Federal Building and U.S. Courthouse in Boise, Idaho.



DATED: **January 10, 2008**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order – Page 18**