IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BALIVI CHEMICAL CORPORATION, | Case No. CV-07-353-S-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| JMC VENTILATION REFRIGERATION, LLC., et al., | |
| Defendants. | |

## INTRODUCTION

The Court held a *Markman* hearing on May 27, 2008, to interpret the claims of United States Patent No. 4,887,525 ("'525 patent). The Court's interpretation is set forth below.

## FACTUAL BACKGROUND

The '525 patent describes an apparatus for applying sprout inhibiting chemicals to potatoes stored inside potato storage buildings. Stored potatoes are living organisms, growing sprouts and giving off heat, both of which cause the potatoes to deteriorate and lose commercial value. To prevent the potatoes from overheating, the storage buildings have robust ventilation systems. To prevent the

**Memorandum Decision and Order – Page 1**

potatoes from sprouting, the potatoes are sprayed with sprout-inhibiting chemicals.

But these two preventative measures work at cross purposes. The turbulent air flow keeps things cool but creates problems for applicators spraying sprout-inhibiting chemicals. To reach the potatoes, the sprayed chemicals need to remain as an aerosol suspended in air. The turbulent air flow, however, causes the aerosol chemicals to condense (or "agglomerate") on ventilation machinery, wasting a significant amount of the chemicals and creating a coating that is difficult to remove. The air flow and turbulence need to be temporarily reduced while spraying is ongoing.

The '525 patent addresses these problems by describing (1) a means for reducing turbulence by using a variable frequency generator to temporarily reduce fan speeds, (2) a means for atomizing a sprout inhibiting chemical, and (3) a means for introducing the atomized chemical into the storage building.

The application for what became the '525 patent was rejected a number of times by the Patent and Trademark Office (PTO) but finally issued on December 19, 1989. In 2000, Balivi filed an infringement action on the '525 patent against Chemical Supply Company in this District. *See Balivi v. Chemical Supply Co.*, CV-00-148-S-ECR. A *Markman* hearing was held, and Judge Reed interpreted the '525 patent. The Court will discuss below that interpretation and its precedential

**Memorandum Decision and Order – Page 2**

value in this case.

Balivi filed this infringement action against JMC in 2007. Both sides have filed briefs urging the Court to adopt their interpretation of the '525 patent, and submitted a stipulation that the *Markman* hearing "will not involve the testimony of live witnesses." *See Stipulation (docket no. 55).* The parties also did not submit any affidavits of experts.

Claim One of the '525 patent claims as follows:

> In a potato storage facility having an air supply plenum, a fan and a fan motor, an apparatus for applying a sprout inhibiting chemical to the stored potatoes which comprises:
> means for reducing turbulence and the air flow in the air supply plenum below 5 standard cubic feet per minute per ton of potatoes stored therein;
> means for atomizing a sprout inhibiting chemical;
> means for introducing the atomized chemical into the air supply plenum of the potato storage facility.

Claim Two reads as follows:

> The apparatus of Claim No. 1 wherein the means for reducing the air flow in the air supply plenum is a frequency generator connected between the power supply for the fan motor and the fan motor.

## STANDARD OF REVIEW

1. **Principles of Interpretation**

The Court engages here in the first step of the two-step infringement analysis – determining the scope and meaning of the patent claims at issue. *See*

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir. 1995)(en banc), *aff'd*, 517 U.S. 370 (1996).  The construction of a patent is a matter of law for the Court to decide.  *Id.*

To interpret the claims, the Court must look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history.  *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir. 1996).  Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.  *Id.*

In evaluating the intrinsic evidence, the Court examines first the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention.  *Id.* Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history.  *Id.*

Accordingly, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning.  The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.  *Id.*  Claims must

**Memorandum Decision and Order – Page 4**

be read in view of the specification, of which they are a part. *Id.* The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term. *Id.*

Instrinsic evidence also includes the prosecution history of the patent, if in evidence, which includes the complete record of all the proceedings before the Patent and Trademark Office (PTO), including any express representations made by the applicant regarding the scope of the claims. As such, the record before the PTO is often of critical significance in determining the meaning of the claims. Included within an analysis of the file history may be an examination of the prior art cited therein. *Id.*

In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence.

### 2. **Means-Plus-Function Format**

Under certain circumstances, pursuant to 35 U.S.C. § 112, ¶ 6, a claim element can be expressed as a means for performing a specified function without reciting a detailed structure to perform that function. This format is referred to as a

**Memorandum Decision and Order – Page 5**

means-plus-function format. In this format, the claim describes a means for performing a function from which a structure for an apparatus can be identified. *See Patent Law & Practice* at p. 126 (3rd ed. 2001).

While a means-plus-function claim literally calls for any means capable of performing the indicated functions, courts have been reluctant to accord such claims that breadth of meaning. Mills, Reiley & Highley, *Patent Law Fundamentals*, § 14:33 (2d ed. 2008). Courts limit a means-plus-function expression to the "means" actually disclosed in the specification and equivalents thereof. *Id.* The price that must be paid for use of the convenience of the means-plus-function format is limitation of the claim to the means specified in the written description and equivalents thereof. *O.I. Corp. v. Tekmar Co., Inc.,* 115 F.3d 1576 (Fed.Cir. 1997).

A presumption applies that a claim limitation that includes the word "means" is intended to invoke means-plus-function treatment. *Aristocrat Tchnologies Australia Pty Ltd. v. Multimedia Games, Inc* 2008 WL 484449 (Fed.Cir. Feb. 22, 2008). However, that presumption may be rebutted (1) if the claim limitation recites no function corresponding to the means or (2) if the claim limitation itself recites sufficient structure for performing the recited function. *Id.*

Once a court concludes that a claim limitation is a means-plus-function

**Memorandum Decision and Order – Page 6**

limitation, two steps of claim construction remain: 1) the court must first identify the function of the limitation; and 2) the court must then look to the specification and identify the corresponding structure for that function. *Id.* If there is no structure in the specification corresponding to the means-plus-function limitation in the claims, the claim will be found invalid as indefinite. *Id.*

While the specification must contain structure linked to claimed means, this is not a high bar: "[a]ll one needs to do in order to obtain the benefit of [§ 112, ¶ 6] is to recite some structure corresponding to the means in the specification, as the statute states, so that one can readily ascertain what the claim means and comply with the particularity requirement of [§ 112,] ¶ 2." *Id*. (citations omitted). Additionally, interpretation of what is disclosed in the specification must be made in light of the knowledge of one skilled in the art. Thus, in order for a means-plus-function claim to be valid under § 112, the corresponding structure of the limitation "must be disclosed in the written description in such a manner that one skilled in the art will know and understand what structure corresponds to the means limitation. Otherwise, one does not know what the claim means." *Id.* However, "the testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification." *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc*., 412 F.3d 1291, 1302 (Fed.Cir.2005).

**Memorandum Decision and Order – Page 7**

## ANALYSIS

The '525 patent is written in pure means-plus-function language. Thus, it is entitled to a presumption that it is covered by § 112, ¶ 6. Indeed, JMC stipulated that the second means element – the "means for atomizing a sprout inhibiting chemical" – is governed by § 112, ¶ 6. *See Stipulation* at ¶ (b), p. 2. Thus, the Court will proceed on the basis that the first and third means elements are presumed covered by § 112, ¶ 6, while the second means element is conclusively covered by the statute.

The Court turns now to determine the function associated with each of the three means set forth in Claim One, and then to identify the corresponding structure. In doing so, the Court finds instructive, but not determinative, Judge Reed's decision in the *Chemical Supply* case interpreting this same patent. The parties here agree that this Court is not bound by Judge Reed's decision, and may adopt, modify, or reject his analysis depending on new arguments raised here and the current state of the law. *See Townshend Intellectual Property LLC v. Broadcom Corp.*, 2008 WL 171039 (N.D. Cal. January 18, 2008).

Judge Reed interpreted the three means described in the first claim, describing first their function and then identifying from the specification the structure that performed that function. The Court rejects JMC's argument that Judge Reed only interpreted one of the means elements. Judge Reed's decision is set forth below in summary form by way of a table:

| Means | Function | Structure |
|---|---|---|
| *Means for reducing turbulence and the air flow in the air supply plenum below 5 SCFPM per ton of potatoes stored.* | (1) To reduce turbulence; (2) To reduce air flow below 5 SCFPM. | A frequency generator. |
| *Means for atomizing a sprout inhibiting chemical.* | To convert the solid form of the sprout inhibiting chemical to an aerosol. | Thermal fogger |
| *Means for introducing the atomized chemical into the air supply plenum of the potato storage facility.* | To transport the atomized chemical from the thermal fogger to the storage facility. | Structure, tube, duct or pipe. |

The Court will engage in its own review of the three means elements of Claim One by reviewing each individually.

1.      **First Means – Function & Structure**

With regard to the first means, the language of Claim One is clear and unambiguous: The first means is a means to (1) reduce air flow below 5 standard

**Memorandum Decision and Order – Page 9**

cubic feet per minute and (2) reduce turbulence.  With regard to the structure in the specification corresponding to these two functions, the language is again clear that the structure is the frequency generator.  The Court therefore agrees with Judge Reed's analysis on this point.

JMC argues, however, that the first structure must also include (1) an outlet for electrical power supplied from within the storage facility, and (2) the temporary connection (with jumper cables) of the frequency generator to the fan motor.  *See JMC Brief* at p. 13.  The Court disagrees.  These items simply enable the apparatus to perform the stated functions; they do not perform the function themselves.  That makes all the difference according to *Asyst Technologies, Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed.Cir. 2001): "An electrical outlet enables a toaster to work, but the outlet is not for that reason considered part of the toaster. The corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended . . . ."

In this case, the function is reduced air flow and turbulence.  The electrical power outlet and jumper cables do not perform that function but merely enable its performance.  Hence, they cannot be deemed to be part of the structure for claim interpretation purposes.

**Memorandum Decision and Order – Page 10**

JMC also argues that the structure must include the actual ability to reduce turbulence and air flow.  JMC asserts that both the patent language and the prosecution history support its distinction that the structure corresponding to the first means cannot just be capable of reducing turbulence and air flow but must actually do so.

The language of the patent does not support this reading.  Claim One is written in pure means-plus-function language, which merely requires the apparatus to be capable of performing the functions.  *See Fantasy Sports v. Sportsline.Com Inc.,* 287 F.3d 1108 (Fed.Cir. 2002).

JMC does not seriously contest this point, but argues that the prosecution history transforms what might appear to be a means-plus-function patent into a method patent, where the structure must include actual performance, not just capability.  This reading, JMC asserts, is supported by a close examination of the course of the patent application through the PTO.  Because the prosecution history is in evidence and important to patent construction, the Court will review the history of the '525 patent.

The original patent application said nothing about reducing turbulence, and only discussed reducing air flow.  *See Exhibit 2 to McBrayer Declaration*.  The patent examiner rejected the claims, finding that "[i]t is well known" that reducing

**Memorandum Decision and Order – Page 11**

air flow will permit more effective treatment of stored produce. *See Exhibit 3.*

In response, the applicant described the agglomeration problem and asserted that "[m]erely reducing the air flow . . . will not in and of itself necessarily solve the problem . . . . The problem is that it still results in turbulent air flow and the resulting agglomeration. The present invention solves all of the problems associated with the application of CIPC to stored potatoes." *See Exhibit 4.* While the applicant made this argument in an affidavit to the examiner, he did not add any language to the claims about reducing turbulence. *See Exhibit 7.* The examiner once again rejected the application, finding that the use of a frequency generator to reduce air flow was obvious. *See Exhibit 8.*

Again, the applicant pointed out the agglomeration problem and argued that nothing in the prior art disclosed the use of a frequency generator to reduce turbulency and thereby reduce CIPC agglomeration. *See Exhibit 9.* The applicant also noted how other solutions for reducing air flow – such as baffles and intermittent fans – actually increased turbulence, and hence were unworkable. Nevertheless, the examiner rejected these arguments without comment. *See Exhibit 10.*

**Memorandum Decision and Order – Page 12**

To this point, the applicant had drafted Claim One as a method claim. Now for the first time, the applicant drafted it as a means-plus-function claim, in much the same format that it is in today, but still without claiming reduced turbulence. *See Exhibit 11*. Predictably, the examiner again rejected the claim, finding that "[i]t would have been obvious to one of ordinary skill in the art to provide [the] fan motor of Sheldon III, et. al. or Brower with a frequency generator for reducing the speed of the motor in order to reduce the air flow to prevent excessive harmful concentrations of CIPC." *See Exhibit 12*.

Finally the applicant amended the application to claim "a means for reducing both the turbulence and the air flow rate . . . ." *See Exhibit 13*. That application was granted and the patent issued on December 19, 1989.

JMC argues that this prosecution history shows that Balivi "seeks a construction that is identical to what it abandoned when it amended its claims." *See Defense Brief* at p. 14. The Court disagrees. In his final amendment, the applicant abandoned an apparatus capable only of reducing air flow (without reducing turbulence), and it is not trying to claim that invention here.

Even so, JMC argues, "Balivi explained to the patent office, the amended claims were patentable because the claimed apparatus would actually reduce both turbulence and air flow, thereby reducing agglomeration of CIPC in potato storage

**Memorandum Decision and Order – Page 13**

facilities." *Id*. at p. 16.  JMC points to similar testimony in the *Chemical Supply* trial from Balivi's expert and its Rule 30(b)(6) witness, that the frequency generator must actually be used to reduce airflow and not just be capable of such use.  On the basis of this evidence, JMC urges the Court to "require actual reduction of both turbulence and air flow," and essentially read the patent as a method patent.  *Id*.

    While the applicant pursued a method patent with the PTO for a time, he later dropped all such language and substituted in its place the means-plus-function language.  Once that occurred, the Court can find no evidence in the patent history that the applicant retreated to a method patent in his arguments to the PTO, and no evidence that the examiner was treating the application as anything other than a means-plus-function patent.

    JMC also fails to explain how its argument here squares with its stipulation that the second means is a means-plus-function element governed by § 112, ¶ 6.  This stipulation would foreclose JMC from making this argument at least as to the second means element.

    While JMC has provided excerpts of the testimony of the two witnesses from the *Chemical Supply* case, those excerpts do not disclose whether they were evaluating the prosecution history of the case.  But most importantly, the witnesses

**Memorandum Decision and Order – Page 14**

were neither inventors nor applicants of the '525 patent, and the Court has not been provided with a record sufficient to determine why their testimony was relevant to the interpretation of the patent, and specifically, why it was relevant to the prosecution history.

The '525 patent is worded in means-plus-function language, entitling Balivi to a presumption that it is "entitled to means-plus-function treatment." *Aristocrat, supra*, 2008 WL 484449 at *3. The presumption ripens into a conclusion for the second means element pursuant to the stipulation of the parties, as discussed above. With regard to the other two means elements, the presumption may be rebutted if (1) the claim limitation recites no function corresponding to the means or (2) the claim limitation itself recites sufficient structure for performing the recited function. *Id.* Neither applies here. The claims recite functions corresponding to means and the specification recites sufficient structure for performing the recited function.

For these reasons, the Court refuses JMC's invitation to read the '525 patent as a method patent. The Court agrees in all respects with Judge Reed's interpretation of the first means element.

2. **Second Means Element – Function & Structure**

The parties have stipulated to both the function and the structure of the

**Memorandum Decision and Order – Page 15**

second means element.  They agree that the function is "atomizing a sprout inhibiting chemical" and the corresponding structure is "a thermal fogger."  *See Stipulation* at p. 5.  JMC argues, however, that this definition should be supplemented by a definition of "sprout inhibiting chemical" that includes "pure or substantially pure CIPC."

The Court disagrees.  The plain meaning of "sprout inhibiting chemical" would not be limited to CIPC.  Because the wording of Claim One is clear, "limitations from elsewhere in the specification will not be read in."  *Tates Access Floors, Inc. v. Interface Architectural Resources, Inc.,* 279 F.3d 1357, 1369 (Fed.Cir. 2002).  But even if the specification is examined, it yields no different result.  While the term CIPC was used often in the specification, there is no evidence in that usage that the applicant intended to narrow the definition of "sprout inhibiting chemical" to a single chemical, and "be his own lexicographer and use terms in a manner other than their ordinary meaning."  *Vitronics,* 90 F.3d at 1582.  To so hold, the Court must find "the special definition of the term [to be] clearly stated in the patent specification."  *Id*.  That is not the case here.

### 3.     **Third Means Element – Structure & Function**

In examining the third means, JMC argues that the corresponding structure must include a tube or pipe that releases the atomized chemical into the air at a

**Memorandum Decision and Order – Page 16**

point downstream from the fan. In support of this argument, JMC points to Figure 2, which shows the pipe releasing the atomized chemical downstream of the fan.

While the drawings are part of the specification to be reviewed in identifying the structure, the text governs if it describes a broader structure than depicted in the drawings. *Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed.Cir. 2005). Here, the written text simply says that the atomized chemical is "injected into the central air plenum of the storage facility." *See Col. 2, ll. 58-59.* There is nothing in the specification that describes the atomized chemical as being injected downstream of the fan.

JMC asserts, however, that the "air plenum" – where the atomized chemical is injected – is identified in the drawings as being downstream of the fan. While it is true that an identifying arrow points to an area in front of the fan in identifying the "air plenum," there is nothing on the drawings or in the text that expressly limits the "air plenum" to the area in front of the fan; it could just as easily include the area behind the fan. JMC is attempting to create an express limitation where none exists.

JMC points out, however, that release of the atomized chemical in front of the fan would reduce or eliminate agglomeration on the fan. Because agglomeration is the problem for which this patent is the cure, JMC argues that the

**Memorandum Decision and Order – Page 17**

exhaust location makes a big difference.

The flaw in JMC's analysis is that the patent never states that exhaust location makes a difference. While agglomeration on the fan is identified as a problem, the patent also discusses agglomeration as a problem on the air plenum, vent pipes, and louvers – JMC does not explain how this agglomeration would be cured by releasing the atomized chemical in front of the fan, and the patent is completely silent on that topic. When the specification is read as a whole, there is nothing that would limit this means to injection of the atomized chemical downstream of the fan.

After an independent review, the Court finds that the third means is a means to transport the atomized chemical from the thermal fogger to the storage facility. The corresponding structure is a tube, duct or pipe.

**4.     Validity**

JMC asserts that claims should be construed to preserve their validity and that the Court's interpretation renders the claim invalid. The Federal Circuit has "not endorsed a regime in which validity analysis is a regular component of claim construction." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1327 (Fed.Cir. 2005). Instead, it is limited to cases in which "the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous." *Id*. When

**Memorandum Decision and Order – Page 18**

ambiguity forces the Court to choose from among several equally reasonable interpretations, the Court should choose the one that preserves the claim's validity. *Id.,*

Here, there is no ambiguity. Thus, validity analysis plays no role, and the Court therefore declines to adopt JMC's argument on this point.

**5.      Final Conclusion of Claim One**

The Court interprets Claim One of the '525 patent as follows:

| Means | Function | Structure |
|---|---|---|
| *Means for reducing turbulence and the air flow in the air supply plenum below 5 SCFPM per ton of potatoes stored.* | (1) To reduce turbulence; (2) To reduce air flow below 5 SCFPM. | A frequency generator. |
| *Means for atomizing a sprout inhibiting chemical.* | To convert the solid form of the sprout inhibiting chemical to an aerosol. | Thermal fogger |
| *Means for introducing the atomized chemical into the air supply plenum of the potato storage facility.* | To transport the atomized chemical from the thermal fogger to the storage facility. | Tube, duct or pipe. |

**6.      Final Conclusion of Claim Two**

Claim Two, set forth in full above, is an apparatus claim that depends on Claim One. It therefore tracks all of the Court's construction of Claim One, except

**Memorandum Decision and Order – Page 19**

the structure corresponding to the first means element is a frequency generator serially connected between the power supply for the fan motor and the fan motor.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the Court's construction of United States Patent No. 4,887,525 is set forth above.

IT IS FURTHER ORDERED, that counsel meet together and attempt to work out stipulated dates to govern the infringement analysis, and inform the Court's law clerk David Metcalf (208) 334-9025 by August 1, 2008, as to whether they are able to reach agreement.



DATED: **July 14, 2008**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order – Page 20**