IN THE UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| BALIVI CHEMICAL CORPORATION, an Idaho corporation,<br><br>　　　　Plaintiff,<br><br>v.<br><br>JMC VENTILATION REFRIGERATION, LLC, a Washington limited liability company, JMC ENTERPRISES, INC., a Washington corporation, JMC LEASING, LLC, a Washington limited liability company and JOEL MICKA, an individual,<br><br>　　　　Defendants. | **MEMORANDUM OPINION AND ORDER**<br><br>Case No. 1:07-CV-353<br><br>Judge Dee Benson |

　　　　This matter is before the court on defendants and counterclaimants JMC Enterprises, Inc., JMC Leasing LLC, JMC Ventilation Refrigeration, LLC, and Joel Micka's (collectively "JMC") motion for summary judgment (Dkt. No. 121) and plaintiff and counterdefendant Balivi Chemical Corporation's motion for partial summary judgment (Dkt. No. 131).  Hearings on the motions were held on October 15, 2009 and February 19, 2010.  At the hearings, Balivi was represented by William L. Mauk and Edgar R. Cataxinos.  JMC was represented by Richard C. Boardman, Jerry A. Riedinger, and Ryan J. McBrayer.  After taking the motions under advisement, the court has further considered the law and facts relating to the motions.  The court has also considered supplemental memoranda and supporting materials submitted by the parties on May 5, 2010.  Being fully advised, the court issues the following Memorandum Opinion and Order.

BACKGROUND

　　　　This case centers on a patent developed in Idaho, which fittingly deals with potatoes.

Potatoes are frequently stored following harvest in the fall for a number of months until spring or,

often times, the following summer.  Stored potatoes are living organisms, growing sprouts and giving off heat, both of which can cause the potatoes to deteriorate and lose commercial value. Typically, the potatoes are stored in large piles within potato storage facilities.  To prevent the potatoes from overheating, the storage facilities have sophisticated ventilation systems to keep the potatoes cool.  To prevent the potatoes from sprouting, the potatoes are sprayed with sprout inhibiting chemicals.  For years, these sprout inhibiting chemicals, including Isopropyl M-Chlorocarbanilate ("CIPC"), have been applied as a fog circulated within the facility's ventilation system.  In this process, the chemical fog moves through ventilation pipes, out through vent holes, and filters up through the pile of potatoes, depositing the chemical on the potatoes.  However, there is a big problem with this process because the powerful air flows within the ventilation system cause the chemical fog to agglomerate on the ventilation equipment, wasting a significant amount of chemical and creating a coating that is difficult to remove and capable of shutting down the ventilation system.  Here, the patentee had the idea that he could avoid agglomeration by reducing airflow and turbulence in the potato storage facility during an application.  A typical storage facility's air ventilation system operates between 10 and 30 standard cubic feet per minute ("SCFM"), per ton of potatoes in storage.  The patentee discovered he could use a frequency generator to temporarily reduce the turbulence and air flow below 5 SCFM.

The patentee filed an application for what became U.S. Patent 4,887,525 (the `525 patent) on December 9, 1988.  Originally, he sought a patent on a method and apparatus that only reduced airflow in the potato storage facility.  The Patent and Trademark Office ("PTO") rejected the application a number of times on obviousness grounds.  Eventually, the patentee amended his application to claim an apparatus that reduced both airflow and turbulence in the storage facility. The PTO allowed the amendment and granted the `525 patent on December 19, 1989.  The `525

patent includes independent claim 1 and dependent claim 2.  Claim 1 is in means-plus-function form and recites:

> In a potato storage facility having an air supply plenum, a fan and a fan motor, an apparatus for applying a sprout inhibiting chemical to the stored potatoes which comprises:
>
> (a)      means for reducing turbulence and the air flow in the air supply plenum below 5 standard cubic feet per minute per ton of potatoes stored therein;
>
> (b)      means for atomizing a sprout inhibiting chemical;
>
> (c)      means for introducing the atomized chemical into the air supply plenum of the potato storage facility.

`525 patent, col. 6, lines 22–31.  Claim 2 reads: "The apparatus of claim No. 1 wherein the means for reducing the air flow in the air supply plenum is a frequency generator serially connected between the power supply for the fan motor and the fan motor."  *Id.* at col. 6, lines 32–35.  The `525 patent expired on May 12, 2008.  During the life of the `525 patent, it experienced great commercial success in the potato storage industry.  Balivi, by assignment, owns the patent.

JMC Enterprises was formed in 1997 by Joel Micka and his wife to apply sprout inhibiting chemicals to agricultural products, including potatoes, in the Columbia Basin.  The Mickas also own and operate JMC Ventilation, a ventilation parts supplier, and JMC Leasing, a chemical reseller.  Until November 2004, JMC Enterprises had a non-exclusive applicator's license from Balivi to use the `525 patent.  The court is unfamiliar with the specific facts that lead to the termination of the license.  From the time JMC Enterprises ceased to have permission to practice the `525 patent, JMC claims it has used Xeda's ELECTROFOG EWH10000 (the "Xeda thermal fogger") to apply sprout inhibiting chemicals to stored potatoes.[1]  As shown, the Xeda thermal

_____

[1]The court notes there is a dispute about whether JMC has used the Xeda foggers exclusively since 2004, or used modified Leco foggers with a flexible pipe part of the time.  However, for the purpose of summary judgment, the parties have focused their infringement analyses on the Xeda fogger.

fogger includes a high-pressure fan, heating resistance (heater), adjustable-rate volumetric pump, vaporization pipe with aerosol product injector, and electrical panel.



The electrical panel includes controls, warning lights, and digital thermostats that indicate the fog temperature on the vaporization pipe outlet and the resistance output temperature.

In a typical application, JMC Enterprises creates a wall or barrier of plywood or visquine between where the fogger's electrical panel, heater, and blower are located and where the





storage air circulates.  JMC Enterprises extends the fogger's vaporization pipe through a hole in the plywood or visquine, sealed tightly with duct tape, and discharges atomizing or atomized CIPC into the air supply system.  JMC Enterprises uses a frequency generator to lower the speed of fans and air flow through the potato storage facility during application of CIPC to the stored potatoes.

In August 2007, Balivi filed an infringement action on the `525 patent against JMC. In May 2008, a *Markman* hearing was held, and the court interpreted the `525 patent. In JMC's proposed claim construction, JMC attempted to construe the claims in several different ways to avoid infringement. First, JMC argued that the corresponding structure in the first means element included (1) an outlet for electrical power supplied from within the storage facility, and (2) the temporary connection (with jumper cables) of the frequency generator to the fan motor. Second, JMC argued that the same structure must actually be used to reduce airflow and not just be capable of such use. Third, JMC argued that the definition of "sprout inhibiting chemical" in the second means element is limited to "pure or substantially pure CIPC." Fourth, JMC argued that the corresponding structure in the third means element must release the atomized chemical into the air at a point downstream from the fan. These arguments were rejected by the court and claim 1 was construed as follows:

| Means | Function | Structure |
|-------|----------|-----------|
| *Means for reducing turbulence and the air flow in the air supply plenum below 5 SCFPM per ton of potatoes stored.* | (1) To reduce turbulence; (2) To reduce air flow below 5 SCFM. | A frequency generator. |
| *Means for atomizing a sprout inhibiting chemical.* | To convert the solid form of sprout inhibiting chemical to an aerosol. | Thermal fogger. |
| *Means for introducing the atomized chemical into the air supply plenum of the potato storage facility.* | To transport the atomized chemical from the thermal fogger to the storage facility. | Tube, duct or pipe. |

The court's construction of the third means element makes it clear that the discharge location of the "tube, duct, or pipe" inside the storage facility is irrelevant. The court also construed claim 2 to track all of the court's construction of claim 1, except the structure corresponding to the first

means element is a frequency generator serially connected between the power supply for the fan motor and the fan motor.

In December 2008, Balivi moved for partial summary judgment and JMC moved for summary judgment.[2]  The arguments on both sides can be divided into three groups: (1) those addressing the issue of infringement; (2) those addressing the validity of the `525 patent; and (3) those addressing the enforceability of the `525 patent.

With regard to the infringement claims, Balivi moved for summary judgment, claiming as a matter of law that JMC directly infringes the `525 patent.  Conversely, JMC claims the court can decide as a matter of law that JMC does not directly infringe the `525 patent.  JMC also argues that the court can decide that Joel Micka is not personally liable for any direct infringement by JMC.  Lastly, JMC asserts that the court can decide as a matter of law that JMC is not liable for indirect infringement.

With regard to the validity of the `525 patent, Balivi claims the court can decide as a matter of law that the `525 patent meets the enablement and written description requirements of 35 U.S.C. § 112, ¶ 1.  Balivi also claims that as a matter of law the `525 patent is non-obvious.  On the other hand, JMC claims the court can decide as a matter of law that the `525 patent is invalid on obviousness grounds.

With regard to the enforceability of the `525 patent, Balivi claims that as a matter of law the court can determine that Balivi has not misused the `525 patent.

---

[2]At the October 15 hearing, JMC dismissed the affirmative defense of anticipation and invalidity based on anticipation.  In turn, Balivi voluntarily dismissed the claim of direct infringement on the part of JMC Ventilation.  Balivi also voluntarily dismissed the claims of contributory infringement against JMC Leasing and JMC Ventilation.  (*See* Tr. Mot. Hr'g at 7, dated October 15, 2009.)  At the February 19 hearing, Balivi voluntarily dismissed its claim of joint infringement.  (*See* Tr. Mot. Hr'g at 116, dated February 19, 2010.)

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  But, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence upon which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

DISCUSSION

At its core, patent law is simple and intuitive.  Patents give a patentee the right to exclude others from using his or her invention.  In exchange, the patentee provides a public disclosure of the invention.

The court's analysis will first address infringement, then validity, then enforceability of the `525 patent.

A.  Infringement

The parties' motions for summary judgment include both direct and indirect infringement claims.

*1.  Direct Infringement*

For direct infringement, Balivi and JMC both claim that the court can determine as a matter of law that JMC does or does not literally infringe the `525 patent.  JMC alone contends

that the court can also determine that JMC does not directly infringe under the doctrine of equivalents.  Lastly, JMC claims that the court can determine as a matter of law that no direct infringement liability exists for Joel Micka.

A determination of direct infringement consists of two steps: (1) the court must first interpret the claim, and (2) then it must compare the properly construed claims to the allegedly infringing device.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). "Summary judgment on the issue of [direct] infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents."  *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005).

*(a)  Literal Infringement*

In order to prove literal infringement, the patentee must show "that the relevant structure in the accused device perform[s] the identical function recited in the claim and [is] identical or equivalent to the corresponding structure in the specification."  *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1320 (Fed. Cir. 2003).  Literal infringement always requires functional identity, i.e., that is the accused device must perform the identical function recited in the claim.  *See Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1328 (Fed. Cir. 2003).

Relying mainly on the court's claim construction and the preferred embodiment disclosed in the patent, JMC now argues that there is no literal infringement because JMC Enterprises does not use the claimed "tube, duct, or pipe" limitation.  JMC claims there is no functional or structural identity between the claimed "tube, duct, or pipe" and Xeda's vaporization pipe because the `525 patent requires a "thermal fogger" to atomize the sprout inhibiting chemical and a separate "tube, duct, or pipe" to transport the atomized chemical from the "thermal fogger" to the potato storage facility.  According to JMC and its expert, Dr. Stock, the vaporization pipe in JMC

Enterprises' accused device takes in vapor from the thermal fogger and atomizes the chemical in a diffuser section of the pipe or inside the facility. Basically, JMC's argument is that literal infringement cannot exist because the structural and functional design of Xeda's vaporization pipe is to make the "atomized chemical," not to transport it. At one point, JMC claimed the vaporization pipe cannot satisfy both the "thermal fogger" and "tube, duct, or pipe" elements because combining the two structures into one violates the "all elements" rule by eliminating the separate "tube, duct, or pipe" element.

In response, Balivi argues that the vaporization pipe performs the identical function and is the same as or equivalent structure to the claimed "tube, duct, or pipe." According to Balivi, the function of the third means element is very simple. The "tube, duct, or pipe" transports the atomized chemical from where the chemical is atomized to the open end of the pipe and from there into the potato storage facility. Balivi and its expert, Dr. Hyde, Dr. Hyde claim that atomization occurs in the Xeda fogger, within the meaning of the patent, where the liquid chemical is injected and hit with super-heated air, approximately two-inches upstream of the vaporization pipe. Balivi argues there is functional identity between the vaporization pipe and the "tube, duct, or pipe" because atomized chemical is blown from Xeda's fogger unit, outside the area where potatoes are stored, through Xeda's vaporization pipe into the potato storage facility. Balivi also argues the vaporization pipe is the same or equivalent structure because a person of ordinary skill in the art would understand the "tube, duct, or pipe" structure is "any" enclosed conduit capable of "transport[ing] the atomized chemical from the thermal fogger to the storage facility." Finally, Balivi argues that even if the vaporization pipe is part of the Xeda thermal fogger, there is nothing in the language of the patent or the court's claim construction or, for that matter, the so-called "all elements" rule, that requires independent devices. All that is required is that JMC's accused device contains each limitation of the claim.

The court finds that summary judgment on literal infringement is inappropriate.  In so doing, the court finds (1) that the `525 patent does not require a "tube, duct, or pipe" that is separate and distinct from the thermal fogger and (2) there are disputed issues of material fact that preclude summary judgment.

First, as a matter of law, the court finds that the "vaporization pipe" can serve as the structure to perform both the function of the "thermal fogger" and the "tube, duct, or pipe."  The United States Court of Appeals for the Federal Circuit has recognized that a single structural element may perform two functions and may also support two different claim terms.  *See Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1320 n.9 (Fed. Cir. 2003); *In re Kelley*, 305 F.2d 909, 914 (1962).  The court recognizes that the preferred embodiment in the `525 patent discloses a pipe separate from the thermal fogger.  *See* `525 patent, figure 2; *id.* at col. 5, lines 4–6 ("thermal fogger 26 is used to create an aerosol fog of CIPC which is then introduced into the air supply plenum through pipe 27").  However, the court will not import limitations from the specification to limit the claims where the patentee has not demonstrated a clear intent to do so.  *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (noting that it is inappropriate to import limitations from the specification to limit facially broad claims unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction).  Claim 1 of the patent recites:

> In a potato storage facility having an air supply plenum, a fan and a fan motor, an apparatus for applying a sprout inhibiting chemical to the stored potatoes which comprises:
>
> (a)    means for reducing turbulence and the air flow in the air supply plenum below 5 standard cubic feet per minute per ton of potatoes stored therein;
>
> (b)    means for atomizing a sprout inhibiting chemical;

10

(c)     means for introducing the atomized chemical into the air supply plenum of
        the potato storage facility.

`525 patent, col. 6, lines 22–31.  The court construed the phrase "means for atomizing a sprout

inhibiting chemical" as a "thermal fogger."  This structure functions "to convert the solid form of

the sprout inhibiting chemical to an aerosol."  The court construed the phrase "means for

introducing the atomized chemical into the air supply plenum of the potato storage facility" as a

"tube, duct, or pipe."  This structure functions "to transport the atomized chemical from the

thermal fogger to the storage facility."  There is nothing in the patent language or the court's

claim construction that requires the means-plus-function elements to be independent devices.  The

Xeda fogger with the vaporization pipe could support the claimed "thermal fogger" if it atomizes

sprout inhibiting chemical.  The same vaporization pipe could also support the claimed "tube,

duct, or pipe" if any length of the pipe transports atomized chemical from the "thermal fogger" to

the storage facility.  Hence, the vaporization pipe can literally be both the "thermal fogger" and

the "tube, duct, or pipe."

        JMC's argument that the "all elements" rule mandates a finding of no direct infringement

because the `525 patent requires a "thermal fogger" and a separate "tube, duct, or pipe" is

incorrect.  *See TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1379 (Fed. Cir.

2008) (explaining that under the "all elements" rule, to find patent infringement, the accused

device must contain each limitation of the claim).  As discussed above, there is nothing in the

`525 patent specification or the court's claim construction that requires the "thermal fogger" and

"tube, duct, or pipe" limitations be embodied as two separate structural components.  All that is

required for direct infringement under the "all elements" rule is that JMC's accused device

contains each limitation.  Accordingly, the vaporization pipe can satisfy the "thermal fogger" and

"tube, duct, or pipe" limitations without violating the "all elements" rule.

Second, although the vaporization pipe can satisfy the "thermal fogger" and "tube, duct, or pipe" elements of the `525 patent, the court finds the function and structure of the vaporization pipe are contested issues of fact that preclude summary judgment.  Whether an accused device infringes a claim with a § 112, paragraph 6 limitation (literally or equivalently) is a question of fact.  *See IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1430 (Fed. Cir. 2000).  To find summary judgment on infringement, the court must find that no reasonable juror could find otherwise.  *Id.*  Here, the experts have provided competing opinions on the function of the vaporization pipe.  The claimed "tube, duct, or pipe" must transport "atomized chemical" from the "thermal fogger" to the storage facility.  The vaporization pipe can only transport atomized chemical if atomization occurs at some point before the end of the vaporization pipe.  JMC's expert claims that the atomization does not occur until the chemical reaches the diffuser section at the end of the vaporization pipe or until it is inside the storage facility.  Dr. Stock asserts that atomized chemical is chemical that is first heated into vapor and then condensed back into small particles or a fog.  (Expert Report of Dr. David Stock 12–13.)  Dr. Stock states "the fog does not form at the exit [of the Xeda fogger operating without the vaporization pipe] but rather some distance downstream because it is not until that location that the exit flow has cooled sufficiently for the vapor to condense and form a fog."  (*Id*. at 12.)  Dr. Stock also states "[t]he atomized chemical is not formed until it travels through the vaporizer/diffuser."  (*Id.* at 13.)   On the other hand, Balivi's expert claims that atomization occurs in the Xeda thermal fogger before the chemical enters the vaporization pipe.  In Dr. Hyde's opinion, atomized chemical is simply chemical reduced to minute particles or to a fine spray.  (Supp. Report of Dr. Gary Hyde 30.)  Dr. Hyde states:

> In the tests we conducted the various chemicals and mixes were atomized within the
> meaning of the Patent in the fogger unit in the immediate vicinity of where the

chemical liquid is hit with super-hot air.  By the time the chemical exits the fogger unit it is fully atomized.  The photographs taken of our tests demonstrate this occurred with every chemical, without the Xeda pipe.  In terms of a fog suitable for application, the fogging process of the Xeda is indistinguishable, with and without the vaporization pipe.

(*Id*. at 31.)  Balivi argues that equating atomization with condensation, as Doctor Stock does, renders the term meaningless.  According to Balivi and Dr. Hyde, "[o]nce atomized, the vaporized chemical will inevitably condense when it cools sufficiently.  That could be in the attached pipe – although apparently not to any significant degree in the Xeda pipe – or inside the storage."  (Pl.'s Supp. Mem. on Summ. J. 10.)  This raises the question where the chemical gets atomized in JMC's accused device.  These competing opinions establish that whether or not the vaporization pipe transports atomized chemical to the storage facility is a disputed issue of fact.

In addition to the function of the vaporization pipe, the parties also dispute whether the vaporization pipe has the same or equivalent structure as the claimed "tube, duct or pipe."  JMC argues the vaporization pipe is very different from the claimed "tube, duct, or pipe" because the patent describes a long, uniform diameter, uninsulated pipe and Xeda's vaporization pipe is a short, narrow, varying internal diameter, insulated pipe with a thermodynamic design.  Balivi contends that the vaporization pipe is the same or equivalent structure because the "tube, duct, or pipe" is "any" enclosed conduit capable of "transport[ing] the atomized chemical from the thermal fogger to the storage facility."  The degree to which the vaporization pipe differs from the claimed "tube, duct, or pipe" is also a disputed issue of material fact that precludes summary judgment.

JMC's and Balivi's motions for summary judgment on literal infringement are denied.

13

*(b)  Doctrine of Equivalents*

An accused device that does not literally infringe a means-plus-function claim may nevertheless infringe under the doctrine of equivalents.  *See Kemco Sales Inc. v. Control Papers Co.*, *Inc.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000).  Under the function-way-result test for the doctrine of equivalents, the accused structure must perform substantially the same function, in substantially the same way, to achieve substantially the same result, as the disclosed structure.  *Id.* Whether the relevant structure in the accused device is an equivalent is a question of fact.  *See Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 38 (1997).

The court finds that whether JMC's accused device infringes under the doctrine of equivalents presents a disputed issue of fact that precludes summary judgment.  A reasonable jury could conclude that JMC's accused device is substantially the same as the patented apparatus and that Xeda's vaporization pipe can be fairly characterized as an insubstantial change from the patented apparatus.  *See Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1359 (Fed. Cir. 2005).

JMC's motion for summary judgment of noninfringement under the doctrine of equivalents is denied.

*(c)  Personal Liability for Direct Infringement of Joel Micka*

JMC asserts that Mr. Micka cannot be held personally liable as a corporate officer for the alleged direct infringement of JMC Enterprises because there is no evidence to pierce the corporate veil.  JMC cites *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565 (Fed. Cir. 1986) for the proposition that for direct infringement, evidence sufficient to pierce the corporate veil must support any assertion of personal liability against Joel Micka.  *See id.* at 1579.

Balivi argues that Joel Micka can be personally liable for JMC Enterprises' direct infringement on principles of tort law, without piercing the corporate veil.  In making this argument, Balivi also relies on the *Orthokinetics* case.  *See id.* at 1579.  Balivi asserts that Joel Micka directs, controls, and is aware of the actions of the JMC companies.

The court finds that Balivi has not submitted sufficient facts to support a claim that Joel Micka is personally liable for JMC's alleged infringement under 271(a).  Section 271(a) provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention . . . infringes the patent." 35 U.S.C. § 271(a).  However, absent evidence of personal wrongdoing, officers of an allegedly infringing corporation can be held personally liable for direct infringement only if there is evidence to justify piercing the corporate veil.  *See Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552 (Fed. Cir. 1990)**.**  Here, there is no evidence of personal wrongdoing separate and apart from the corporation and no evidence to pierce the corporate veil.  Additionally, Balivi has not provided evidence that Joel Micka specifically directed anyone to directly infringe.

## 2.  Indirect Infringement

As previously mentioned, JMC also moved for summary judgment of no indirect infringement.  Specifically, JMC claims that the court can determine as a matter of law that JMC is not liable for inducing K-Nip[3] or JMC Enterprises to directly infringe.

### (a)  Induced Infringement

Title 35 of United States Code, Section 271(b) imposes indirect infringement liability on a party who actively induces others to directly infringe a patent.  *See* 35 U.S.C. § 271(b).  To prove

---

[3]K-Nip, Inc., a Colorado chemical applicator, is a customer of JMC Ventilation and JMC Leasing.  K-Nip allegedly has used a fogger, a frequency drive, and a pipe in sprout inhibiting chemical applications for years.

induced infringement, the plaintiff must establish that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement.  *See Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002).  Furthermore, a prima facie case of induced infringement must include proof of the underlying direct infringement.  *Id.*

(i)  Inducement of K-Nip

JMC argues that no one induced K-NIP to infringe because K-Nip acted independently. JMC contends that K-NIP's owners, Dan Keeton and Don Wenta, applied chemicals to stored potatoes using a thermal fogger, frequency generator, and pipe for many years before meeting Mr. Micka.  JMC also argues that summary judgment is also appropriate because K-Nip had an implied license to practice the `525 patent.

Balivi argues JMC induced K-Nip to infringe because JMC sold chemicals to K-Nip knowing that K-Nip used equipment and application practices that infringed the `525 patent.  In addition, JMC Leasing sold sprout inhibiting chemical to K-Nip with a label including instructions for application of the chemical using reduced air flow rates of less than 5 SCFM per ton of potatoes.  Balivi also contests JMC's allegation that K-Nip had an implied license to practice the `525 patent.  Balivi claims this constitutes sufficient evidence that JMC specifically intended infringement by K-Nip.

The court finds there are genuine issues of material fact that preclude the court from granting summary judgment of no induced infringement of K-Nip.  Balivi has provided proof upon which a reasonable jury could find that JMC possessed specific intent to induce K-Nip to infringe.  "While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice."  *Water Tech. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed.

Cir. 1988).  JMC's and Mr. Micka's knowledge of the `525 patent and K-Nip's application methods combined with the application instruction provided by JMC Leasing is sufficient to survive summary judgment on the issue of specific intent.  There is also sufficient evidence of K-Nip's underlying direct infringement.  (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. at 21 ("K-Nip's owners, Mr. Keeton and Mr. Wenta, applied CIPC to potatoes [using] the same 'setup' – a fogger, a frequency drive, and a pipe – for years before they ever met Mr. Micka.").)  Finally, there is a disputed issue of fact whether K-Nip was licensed to practice the `525 patent.

JMC's motion for summary judgment of no induced infringement of K-Nip is denied.

(ii)  Inducement of JMC Enterprises

JMC argues that JMC Ventilation and JMC Leasing did not induce infringement by JMC Enterprises because neither company specifically intended infringement.  JMC contends that evidence that JMC Leasing and JMC Ventilation merely knew of JMC Enterprises' application practices is insufficient as a matter of law to establish specific intent.

To the contrary, Balivi contends there is sufficient evidence that Joel Micka, JMC Leasing, and JMC Ventilation specifically intended infringement by JMC Enterprises.  Joel Micka had complete control over every facet of operation for JMC Leasing, JMC Ventilation, and JMC Enterprises.  They all had knowledge of the `525 patent and JMC Enterprises' accused device.  And, JMC Leasing sold sprout inhibiting chemical to JMC Enterprises that included use directions that expressly called for reduced air flow rates of less than 5 SCFM per ton of potatoes.  Balivi contends this constitutes sufficient direct and circumstantial evidence of inducement to survive summary judgment.

Once again, the court finds there are genuine issues of material fact that preclude summary judgment on the induced infringement of JMC Enterprises.  Balivi has provided proof upon which

17

a reasonable jury could conclude that Joel Micka, JMC Ventilation, and JMC Leasing possessed specific intent to induce JMC Enterprises to infringe.  JMC's and Mr. Micka's knowledge of the `525 patent and JMC Enterprises' application methods combined with the application instruction provided by JMC Leasing is sufficient to survive summary judgment on the issue of specific intent.  Also, whether JMC Enterprises directly infringes or not remains to be decided**.**

JMC's motion for summary judgment of no induced infringement of JMC Enterprises is denied.

### B.  Validity

Both parties moved for summary judgment on the validity of the `525 patent.  An issued patent enjoys a presumption of validity, 35 U.S.C. § 282, that can be overcome only through clear and convincing evidence.  *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 920 (Fed. Cir. 2004).  "Thus, a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise."  *Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001). "Alternatively, a moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent."  *Id.*

*1.  Enablement*

Balivi moved for summary judgment that the `525 patent is not invalid for failing to meet the enablement requirement of § 112.  The enablement requirement of 35 U.S.C. § 112 provides in pertinent part that the specification shall describe "the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the

art to which it pertains, or with which it is most nearly connected, to make and use the invention."
*Id.* ¶ 1.  "Section 112 requires that the patent specification enable those skilled in the art to make and use the full scope of the claimed invention without undue experimentation in order to extract meaningful disclosure of the invention and, by this disclosure, advance the technical arts." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1071 (Fed Cir. 2005) (internal quotation marks omitted).  Whether a claim satisfies the enablement requirement is a question of law, based on underlying facts.  *See AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1238 (Fed. Cir. 2003).

As an affirmative defense and counterclaim, JMC asserts that the `525 patent is invalid for lack of enablement.  Specifically, JMC claims that the `525 patent does not enable a person of ordinary skill in the art to (a) connect the frequency generator, (b) use alternative versions of the invention, or (c) configure the air handling system.

### (a)  Connection of the Frequency Generator

JMC first alleges that the `525 patent does not enable a person of ordinary skill to connect a frequency generator to the facility.  JMC argues that the simplicity of the disclosure in the `525 patent would not allow an applicator of ordinary skill in the art to connect a frequency generator to a storage facility.  JMC's expert report asserts that: "Applicators of ordinary skill did not have the electrical skill required to rewire or modify the wiring of the storage facility. . . .  Applicators would have only been able to open a control panel and push buttons to make the fans work. . . . Applicators of ordinary skill had no experience or ability to access and modify the 220V, 480V or 600V wiring present in storage facilities at the time."  (Expert Report of George Burkholder 13.)

Balivi argues that specification of the `525 patent need not contain every last detail on how to connect a frequency generator between a source of AC power and fan motor.  Balivi contends that applicators skilled in the art could read and were accustomed to successfully following

19

product instructions and technical manuals supplied with machinery, equipment and all kinds of

devices.  In support of this argument, Balivi points to technical manuals like the Toshiba VF

PACK-P1 Technical Data, '87 - Jan., which existed at the time of the invention.  Balivi argues

that those skilled in the art, like Balivi's expert Ken Hunter, used manuals like Toshiba's at the

time of the invention and most importantly, applicators nationwide almost universally adopted the

`525 patent with no evidence of difficulty.

The court finds that JMC has presented insufficient evidence from which a reasonable fact

finder could find the `525 patent did not enable a person of ordinary skill in the art to set up a

frequency generator.  The scope of enablement is that which is disclosed in the specification plus

the scope of what would be known to one of ordinary skill in the art without undue

experimentation.  *Invitrogen,* 429 F.3d at 1070–71.  The specification of the `525 patent discloses

"the use of a high power capacity, variable frequency, generator which is hooked in line between

the standard 3 phase, 60 Hz, power supply source for the storage facility's ventilation fans."  `525

patent, col. 4, lines 19–23.  It provides "[a]s can be seen in FIGS. 2 and 3, a frequency generator

24, utilizing jumper cables 25 is temporarily installed between the 60 cycle standard power supply

control box 23 and the fan motor 12."  *Id*. at col. 4, lines 62–65.  "Frequency generator 24 is then

operated to reduce the frequency being supplied to the fan motor 12 from 60 Hz to 25 Hz,

depending upon the design of the particular air handling system."  *Id*. at col.4, lines 65–68.

JMC's argument is that this disclosure is too simplistic.  However, the court finds a more

extensive disclosure was unnecessary because of what was already known and available to a

person of ordinary skill in the art.  "[The Federal Circuit] has repeatedly explained that a patent

applicant does not need to include in the specification that which is already known to and

available to one of ordinary skill in the art."  *Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381

F.3d 1142, 1156 (Fed. Cir. 2004).  Additional electrical details of the connection would depend on the frequency generator, and technical manuals were available to a person of ordinary skill in the art to provide such details.[4]  The enablement requirement does not demand that every detail of the invention or specification be disclosed in minutiae.

*(b)  Alternative Versions of the Patented Apparatus*

Next, JMC alleges that the `525 patent does not enable a person of ordinary skill to make and use alternative versions of the patented apparatus that Balivi now asserts are part of the invention. *See Auto. Techs. Int'l, Inc. v. BMW of North America, Inc.*, 501 F.3d 1274, 1282 (Fed. Cir. 2007). Specifically, JMC argues that the `525 patent does not enable the full scope of the claims because it fails to enable a person of ordinary skill in the art to apply chemicals other than CIPC and use the patented apparatus in different configurations.

In response, Balivi argues that JMC's alleged omissions are not part of the claimed invention and the patent need only enable one example of the invention and how to use it.  Balivi argues there is no requirement under § 112 to enable use of any particular sprout inhibitor or the way the JMC uses the patented apparatus.

The court finds JMC's alleged omissions are outside the scope of the enablement requirement.  As long as the specification discloses at least one method for making and using the claimed invention that bears a reasonable correlation to the entire scope of the claim, then the enablement requirement is satisfied.  *See Invitrogen,* 429 F.3d at 1071.  Failure to disclose other methods by which the claimed invention may be made does not render a claim invalid for lack of

---

[4]From the prosecution history, it appears clear that the novel aspect of the invention is the use of a frequency generator to reduce air flow and turbulence, not the electrical connection. JMC's argument that "nothing in the prior art gave applicators comfort with modifying high-voltage electrical wiring" does not dispute the existence of technical manuals like the Toshiba VF PACK-P1 at the time of the invention. (*See* Burkholder Report at 13.)

enablement.  *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533–34 (Fed. Cir. 1987).

The `525 patent discloses at least one method for making and using: the frequency generator to

reduce air flow in the potato storage facility to less than 5 SCFM; the thermal fogger to create

atomized sprout inhibiting chemical; and the tube, duct, or pipe to introduce the atomized

chemical into the potato storage facility from the thermal fogger.  This satisfies the enablement

requirement.

      The court finds JMC's reliance on *Automotive Techs. Int'l, Inc. v. BMW of North America,*

*Inc.*, 501 F.3d 1274 (Fed. Cir. 2007) misplaced.  In *Automotive Technologies*, Automotive

Technologies International ("ATI") advocated for and the district court found that the

corresponding structure for a means-plus-function limitation included both mechanical means and

electronic means.  *See Auto. Techs.*, 501 F.3d at 1280.  The court determined, however, that the

specification failed to enable the electronic means and found the claims invalid.  *See id.*  On

appeal, ATI argued that because one embodiment of the invention was enabled, a mechanical

means, the enablement requirement was satisfied.  *See id.* at 1281.  The Federal Circuit held the

full scope of the claims must be enabled, and found the district court was correct that the

specification did not enable the full scope of the invention because it did not enable the electronic

means.  *See id.* at 1282.

      In this case, JMC's alleged omissions are simply different ways to make and use the

patented apparatus, not non-enabled corresponding structure.  "Enablement does not require the

inventor to foresee every means of implementing an invention at pains of losing his patent

franchise."  *Invitrogen*, 429 F.3d at 1071.  Were it otherwise, "patent rights would rapidly become

worthless as new modes of practicing the invention developed."  *Id.*

The court finds failure to describe alternative versions of the invention does not render the specification of the `525 patent non-enabling.[5]

*(c)  Configuration of the Air Supply System*

Finally, JMC alleges that the `525 patent does not enable a person of ordinary skill in the art to configure the air system.  According to Balivi, however, the air handling system and how it is configured are not part of the claimed invention.  Balivi asserts there is no requirement to enable what would amount to a method step that is not recited in the issued claims.

The court finds that lack of disclosure on configuration of the air system does not make the `525 patent non-enabling.  Subject matter outside the scope of the court's construction of the claims is irrelevant to enablement.  *See Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1307 (Fed. Cir. 2001).  In the instant case, the air supply system and its configuration are not claim limitations and the patent specification does not suggest that a balanced air supply system is part of the invention. There is no requirement that the `525 patent enable a person of ordinary skill in the art to configure the air handling system.

Accordingly, the court grants Balivi's motion for summary judgement on enablement.

*2.  Written Description*

Balivi moved for summary judgment that the `525 patent is not invalid for failing to meet the written description requirement of § 112.  Section 112 requires a "written description of the invention" that is separate and distinct from the enablement requirement.  *See* 35 U.S.C. 112, ¶ 1; *Noelle v. Lederman*, 355 F.3d 1343, 1348 (Fed. Cir. 2004) (citing *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991)).  The purpose of the written description requirement is broader

---

[5]This holding also applies to JMC's argument that claim 1 is invalid because the specification fails to enable a frequency generator that is not serially connected.  (*See* Def.'s Mem. in Opp'n to Balivi's Mot. for Partial Summ. J. at 41 n.19.)

than to merely explain how to "make and use."  *See Vas-Cath*, 935 F.2d at 1563.  To satisfy the

written description requirement, the specification must describe every element of the claimed

invention in sufficient detail so that one of ordinary skill in the art would recognize that the

inventor possessed the claimed invention at the time of filing.  *Id.*  "Such description need not

recite the claimed invention in haec verba but must do more than merely disclose that which

would render the claimed invention obvious."  *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d

1368, 1377 (Fed. Cir. 2009).

As an affirmative defense and counterclaim, JMC asserts that the `525 patent is invalid for

inadequate written description.  Specifically, JMC contends that the `525 patent (a) fails to

describe airflow above 5 SCFM, and (b) fails to describe alternative versions of the invention.

*(a)  Airflow above 5 SCFM*

First, JMC alleges that the `525 patent does not adequately describe airflow above 5

SCFM.  In response, Balivi argues this omission is irrelevant because the first element of claim 1

is "means for reducing turbulence and the air flow in the air supply plenum *below* 5 standard

cubic feet per minute" (emphasis added).  The court agrees.

A written description concerning airflow above 5 SCFM is irrelevant to the written

description requirement because it is not part of the claimed invention.  Moreover, Balivi alleges

that JMC's accused device infringes the `525 patent because it is capable of operating *below* 5

SCFM, not because it operates *above* 5 SCFM.

*(b)  Alternative Versions of the Invention*

 Next, JMC alleges that the `525 patent does not adequately describe alternative versions

of the invention.  JMC argues that because the patent describes only one configuration for the

patented apparatus and Balivi now asserts the claims encompass other embodiments (such as one

24

in which the fogger is located inside the storage facility and one in which more than CIPC is applied), the `525 patent fails to meet the written description requirement.  Once again, Balivi responds that JMC's arguments are irrelevant because the claimed invention is directed to an apparatus, not to a method of using an apparatus.  According to Balivi, the choice of a given sprout inhibitor is not an element of the claims.  Balivi also argues that the claims are not limited to an apparatus that discharges at any particular place in the airstream or to placing a fogger at any particular location.

As with the enablement requirement, the court finds that JMC's alleged omissions regarding alternative versions of the patented apparatus do not violate the written description requirement.  The standard for adequate written description is that the specification must show possession of the claimed invention.  *See Vas-Cath*, 935 F.2d at 1563–64.  The `525 patent's written description of a frequency generator to reduce air flow in a potato storage facility to less than 5 SCFM; a thermal fogger to atomize sprout inhibiting chemical; and a tube, duct, or pipe to introduce the atomized chemical into the potato storage facility from the thermal fogger shows possession of the patented apparatus.  The patentee is not required to describe in the specification every conceivable embodiment of his invention.  *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001).

Moreover, the court finds JMC's reliance on *Gentry Gallery, Inc. v. Berline Corp.*, 134 F.3d 1473 (Fed. Cir. 1998) is misplaced.  JMC cites *Gentry Gallery* for the proposition that the `525 patent must describe alternative versions of the patented apparatus to satisfy the written description requirement.  In *Gentry Gallery*, the patent concerned a sectional sofa having a pair of reclining seats with accessible controls.  *Id.* at 1474–75.  The original disclosure identified the console of the sectional as the *only possible location* for the controls.  *Id*. at 1479 (emphasis

added).  The claims, however, were asserted to cover controls anywhere, including on the arms.
*Id*. at 1478.  The Federal Circuit found those claims invalid for lack of written description because
there was no description or support whatever in the *Gentry* patent for the controls being other than
on the console.  *Id.* at 1479–80.  The reasoning set forth in *Gentry Gallery* simply does not apply
in this case because the specification of the `525 patent does not limit the claimed invention to a
single embodiment.  To the contrary, the specification of the `525 patent provides: "[w]hile there
is shown and described the present preferred embodiment of the invention, it is distinctly
understood that this invention is not limited thereto but may be variously embodied to practice
within the scope of the following claims."  `525 patent, col. 6, lines 16–20.  The drawings and/or
the specification do not limit the invention to an apparatus that discharges at any particular place
in the airstream or places a fogger at any particular location.  *See id.* at col. 5, lines 4–6 ("Once the
air flow has been reduced thermal fogger 26 is used to create an aerosol fog of CIPC which is then
introduced into the air supply plenum through pipe 27.").  Moreover, while the term CIPC was
used often in the specification, the specification does not limit the invention to use of a single
sprout inhibitor.  *See id.* at col. 1, lines 12–13 ("This invention relates to an apparatus for applying
sprout inhibiting chemicals to stored potatoes."); *id.* at col. 2, lines 29–31 ("Sprout inhibiting
chemicals such as Isopropyl M-Chlorocarbanilate (CIPC) are typically used to inhibit
sprouting.").

Based on the foregoing, the court grants Balivi's motion for summary judgment of no
invalidity based on written description.

*3.  Non-Obviousness*

Balivi and JMC both claim that the court can determine as a matter of law that `525 patent
is or is not obvious.  Title 35, United States Code, Section 103 "forbids issuance of a patent when

'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103). The determination of obviousness is a legal question based on underlying questions of fact. *In re Kumar*, 418 F.3d 1361, 1365 (Fed. Cir. 2005).

The underlying factual considerations in an obviousness analysis include: the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and any relevant secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1359 (Fed. Cir. 2007). Relevant secondary considerations include: commercial success, long-felt but unsolved needs, failure of others, and the presence of a motivation to combine, or avoid combining, prior art teachings. *KSR*, 550 U.S. at 406, 415–18.

JMC argues that the `525 patent is obvious because it is merely the combination of familiar elements: a frequency generator, a thermal fogger, and a pipe. According to JMC, this is the same combination that the PTO rejected on five different occasions. JMC also argues that even ignoring the PTO, an evaluation of the prior art only confirms invalidity on obviousness grounds. JMC argues that the prior art taught how to apply CIPC with a fogger, a pipe, and the storage facility ventilation system. JMC further asserts that other prior art described frequency drives connected in series to electric motors.

Balivi argues that the `525 patent enjoys a presumption of validity and that the PTO already found the `525 patent non-obvious. Balivi argues that the PTO initially rejected the claims because they read on inoperative prior art structures (such as baffles and intermittent fans)

that only reduced airflow without reducing turbulence, and not because a frequency generator was obvious. Balivi emphasizes that the PTO found the claimed invention patentable after the applicant amended claim 1 to include means for reducing both the turbulence and air flow, and because the amendment further defined the "means" as corresponding to a frequency generator and distinguished the same from prior art mechanisms that increase turbulence. In addition, Balivi contends that JMC has not disclosed any specific evidence or identified any lay or expert witness who could offer testimony detailing any combination of prior art references that describe each and every element as set forth in claims 1 and 2 of the `525 patent, much less any evidence whatsoever to establish obviousness by clear and convincing evidence.

The court finds that JMC has presented insufficient facts to support a claim that the `525 patent is invalid on obviousness grounds. In considering obviousness, "[i]t remains appropriate for a post- *KSR* court considering obviousness 'to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.'" *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1300–01 (Fed. Cir. 2009) (quoting *KSR*, 550 U.S. at 418). "Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." *Grain Processing Corp. v. American Maize-Products Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) (quoting *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1012 (Fed. Cir. 1983)). The combination of familiar elements alone does not make an invention obvious. *See KSR*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious *when it does no more than yield predictable results*." (emphasis added)).

The court construed claim 1 as follows:

| Means | Function | Structure |
|---|---|---|
| *Means for reducing turbulence and the air flow in the air supply plenum below 5 SCFPM per ton of potatoes stored.* | (1) To reduce turbulence; (2) To reduce air flow below 5 SCFM. | A frequency generator. |
| *Means for atomizing a sprout inhibiting chemical.* | To convert the solid form of sprout inhibiting chemical to an aerosol. | Thermal fogger. |
| *Means for introducing the atomized chemical into the air supply plenum of the potato storage facility.* | To transport the atomized chemical from the thermal fogger to the storage facility. | Tube, duct or pipe. |

JMC cites prior art that teaches a thermal fogger, a tube duct or pipe, and a frequency generator. However, there is an absence of evidence that a person of ordinary skill in the art had ever thought of combining the three elements, in the way the `525 patent applicant did to apply sprout inhibiting chemicals with unusually good results.  Simply put, JMC has failed to present sufficient facts upon which a reasonable jury could find clear and convincing evidence that the patented apparatus was obvious to a  person of ordinary skill in the art.

The court grants Balivi's motion for summary judgment of no invalidity based on obviousness.  JMC's motion for summary judgment of invalidity based on obviousness is denied.

## C.  Enforceability

*1.  Patent Misuse*

Finally, Balivi moved for summary judgment on the grounds that there was no patent misuse.  Patent misuse is an affirmative defense to an accusation of patent infringement, the successful assertion of which requires that the alleged infringer show that the patentee has

impermissibly broadened the "physical or temporal scope" of the patent with anti-competitive effect. *See Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed. Cir. 1997).

According to JMC, Balivi is guilty of patent misuse because Balivi asserted two contributory infringement claims against JMC that were baseless. JMC also argues that these baseless allegations caused anti-competitive effect because they coerced K-Nip to buy sprout inhibiting chemicals from a Balivi related company and limit its relationship with JMC. In response, Balivi asserts that there is no misuse because JMC has failed to provide sufficient evidence that Balivi misused the `525 patent with an anti-competitive effect.

The court finds there is insufficient evidence to support JMC's patent misuse defense. JMC has not shown there was an anti-competitive effect. JMC's assertion that this infringement action coerced a single chemical applicator to do business with Balivi's related company does not show anti-competitive effect. No evidence exists that Balivi tied the `525 patent to any condition requiring the purchase of any particular good. Additionally, JMC and Balivi have already stipulated to dismiss the two claims that JMC alleges were baseless. And, JMC has not provided any evidence of bad faith.

The court grants Balivi motion for summary judgment of no patent misuse.

CONCLUSION

Based on the foregoing reasons, Balivi's motion for partial summary judgment is GRANTED in part and DENIED in part. As explained in the opinion, JMC's motion for summary judgment is GRANTED in part and DENIED in part. The court finds Mr. Micka is not personally liable for direct infringement by JMC. The court finds the `525 patent is not invalid. The court finds Balivi did not misuse the `525 patent. There remains triable issues of whether the accused device directly infringes, literally or under the doctrine of equivalents, and whether Joel

Micka, JMC Ventilation, and/or JMC Leasing induced K-Nip and/or JMC Enterprises to directly infringe the `525 patent.

IT IS SO ORDERED.

DATED this 29th day of June, 2010.

Dee Benson
United States District Judge